IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LUIS ALBERTO MARTINEZ,

        Petitioner,                No. CIV S-02-0159 RRB GGH P

    vs.

JOSEPH McGRATH, et al.,

        Respondents.            FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant 28 U.S.C. § 2254. Petitioner challenges his 1999 conviction for first degree murder (Cal. Penal Code §§ 187(a), 189)), attempted murder (Cal. Penal Code §§ 197(a), 664(a)); and street terrorism (Cal. Penal Code § 186.22(a)). Petitioner is serving a determinate three year term for street terrorism, and consecutive life terms of twenty-five years to life for murder and attempted murder.

        This action is proceeding on the second amended petition filed March 27, 2006, as to the following claims: 1) juror misconduct; 2) prosecutorial misconduct; and 3) ineffective assistance of counsel. After carefully considering the record, the court recommends that the petition be denied.

1

1   II.  <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

2          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

3   petition for habeas corpus which was filed after the AEDPA became effective.  <u>Neelley v. Nagle,</u>

4   138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

5   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

6   standards of review to be used by a federal habeas court in assessing a state court's adjudication

7   of a criminal defendant's claims of constitutional error.  <u>Moore v. Calderon</u>, 108 F.3d 261, 263

8   (9th Cir. 1997).

9          In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

10  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

11  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

12  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

13  "unreasonable application of" that law.  <u>Id</u>. at 1519.  "Contrary to" clearly established law applies

14  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

15  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

16  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

17          "Unreasonable application" of established law, on the other hand, applies to

18  mixed questions of law and fact, that is, the application of law to fact where there are no factually

19  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20  <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

21  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

22  deference is not blindly automatic, "the most important point is that an *unreasonable* application

23  of federal law is different from an incorrect application of law....[A] federal habeas court may not

24  issue the writ simply because that court concludes in its independent judgment that the relevant

25  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

26  that application must also be unreasonable."  <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

2   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

3   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

4           The state courts need not have cited to federal authority, or even have indicated

5   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

6   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

7   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

8   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

9   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

10  established Supreme Court authority reviewed must be a pronouncement on constitutional

11  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

12  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

13          However, where the state courts have not addressed the constitutional issue in

14  dispute in any reasoned opinion, the federal court will independently review the record in

15  adjudication of that issue.  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which we can determine whether a silent state

17  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18  2003).

19          When reviewing a state court's summary denial of a claim, the court "looks

20  through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

21  F.3d 1072, 1079 n. 2 (9th Cir. 2000).  As to each claim, this court will discuss which state court

22  opinion is entitled to AEDPA deference.

23  III.  Background

24          Petitioner's first trial ended in a mistrial when the jury was unable to reach a

25  verdict on any of the counts.  CT at 105.

26  \\\\\

3

1           Following a second trial, petitioner was convicted.  A factual summary of

2  petitioner's offenses is contained in the opinion of the California Court of Appeal.  After

3  independently reviewing the record, the court finds this summary to be accurate and adopts it

4  below.

> Murder victim Vincent Lefebre and attempted murder victim Armando Posada were members of the East Side Stocktone gang.  On October 8, 1995, they were riding their bicycles in Stockton when a blue pickup truck began to follow them.  The truck's license plates had been removed, and a window had been taken out to facilitate the firing of a gun.  Five or six Hispanic males were in the truck, which had been stolen two days earlier.
>
> The truck came up beside the two cyclists.  Posada realized that he and Lefebre were going to be shot at.  Posada shouted to Lefebre to shoot at the truck.  The men in the truck fired one or two shotgun blasts, followed by pistol shots.  One of the shotgun blasts killed Lefebre.  Posada was uninjured.
>
> Defendant had been a member of the Vicky's Town street gang, a southern California gang, for "two or three years" prior to December 1, 1997.  In 1997, while defendant was in county jail on an unrelated matter, police intercepted a letter he had written describing his participation in the October 1995 shootings.  When questioned, defendant first denied any involvement but then admitted that he was in the truck at the time of the shootings.  He said that the driver had picked him up, and they, along with two other passengers, were cruising.  The driver and a passenger were members of a southern California gang.  As they passed Waterloo Road, a bicyclist saw them and yelled out ESS, referring to the Eastside Stocktone gang, which was a northern California gang.  The driver yelled back, "puro sur," which means "purse south, all south, all about south."  The driver turned the truck around, and a passenger pulled out a shotgun from under the seat.  When the truck was alongside Lefebre, the passenger fired the shotgun at him.  When Posada fled, the driver took out a pistol and fired at him. The truck sped off, and the group abandoned it on the street.  Defendant admitted that the truck had ventured into northern-gang territory.
>
> A police gang expert testified that the shootings were done for the purposes of the southern California gangs in Stockton, which were involved in a long-standing feud with the northern gangs.

22  Respondent's Lodged Document No. 4, pp. 2-3.

23           On January 17, 2001, the California Supreme Court denied petitioner's petition

24  for review.  Respondent's Lodged Document No. 6.

25  /////

26  /////

IV.  <u>Discussion</u>

        A.  <u>Statute of Limitations</u>

        Respondent argues that petitioner's claim alleging that counsel was ineffective for failing to interview a juror when she came to him post-conviction with allegations of juror misconduct is barred by the statute of limitations.

        The statute of limitations for federal habeas corpus petitions is set forth in 28 U.S.C. § 2244(d)(1):

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

        The California Supreme Court denied petitioner's petition for review on January 17, 2001.  Respondent's Lodged Document no. 6.  Petitioner's conviction became final 90 days later on April 17, 2001.  <u>Bowen v. Roe</u>, 188 F.3d 1157 (9th Cir. 1999).  Petitioner had one year from that date to raise the at-issue ineffective assistance of counsel claim.  The parties do not dispute that petitioner did not raise this claim in the original petition filed January 17, 2002, nor the amended petition filed January 8, 2003.  Petitioner did not raise this claim until he filed the

\\\\\

\\\\\

1  second amended petition on March 27, 2006.  Accordingly, the at-issue claim is barred unless

2  petitioner is entitled to statutory or equitable tolling.[1]

3         28 U.S.C. § 2254(d)(2) provides that the time during which a properly filed

4  application for state post-conviction or other collateral review with respect to the pertinent

5  judgment or claim is pending shall not be counted toward any period of limitation under this

6  section.

7         Petitioner filed a petition for writ of habeas corpus in the California Supreme

8  Court on November 4, 2004.  Respondent's Lodged Document No. 7.  Because this petition was

9  filed after the limitations period ran on April 17, 2002, petitioner is not entitled to statutory

10  tolling based on this petition.

11         The court now considers whether petitioner is entitled to equitable tolling.  The

12  one year statute of limitations for filing a habeas petition may be equitably tolled if

13  "extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on

14  time." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  The prisoner must show that the

15  "extraordinary circumstances" were the cause of his untimeliness. Stillman v. LaMarque, 319

16  F.3d 1199, 1203 (9th Cir. 2003).  "Indeed, the threshold necessary to trigger equitable tolling

17  [under AEDPA] is very high, lest the exceptions swallow the rule." Miranda v. Castro, 292 F.3d

18  1063, 1066 (9th Cir. 2002).  Petitioner "bears the burden of showing that this extraordinary

19  exclusion should apply to him." Id.  Determining whether equitable tolling applies is a "fact-

20  specific" inquiry. Fry v. Hickman, 273 F.3d 1144, 1146 (9th Cir. 2001).

21         Petitioner argues that he is entitled to equitable tolling because the lawyer

22  originally appointed to represent him in this action did not have sufficient time to prepare a

23

24         [1] The juror contacted petitioner's counsel in 1999. See Second Amended Petition,
   Griffin declaration.  The juror then wrote a letter to the court. Id.  A hearing was held in the San
25  Joaquin County Superior Court regarding the contents of the letter on August 16, 1999. Id.
   Therefore, the factual predicate of the at-issue ineffective assistance of counsel claim has been
26  known since 1999.

timely petition raising the at-issue claim.  In support of this claim, petitioner refers to the

declaration of Assistant Federal Defender Ann C. McClintock attached to the traverse.  The

Office of the Federal Defender was appointed to represent petitioner on or about February 1,

2002.  McClintock Declaration, ¶ 2.  Ms. McClintock was assigned to the case on February 6,

2002.  Id.  She states,

> After reviewing the state court records our office obtained and supervising an investigation into a number of claims, on January 8, 2003, I filed an Amended Petition and a notice of the claims I thought needed to be exhausted in the state courts.  Later I also prepared a state exhaustion petition on Mr. Martinez's behalf.  That petition was filed by the California Supreme Court on or about November 4, 2004.
>
> 3.  Our records indicate that our office spent 200.9 hours of investigator work working on Mr. Martinez's habeas case.  It also spent over 85 hours of attorney time and 61 hours of paralegal time during this time.  The office does not track spent by law students or secretaries working on cases, so I have no means of estimating the amount of time such persons spent helping in our collective work on Mr. Martinez's behalf.
>
> 4.  During the approximately eleven months it took for office to complete the investigation, document review, and identification of the exhausted and unexhausted issues in Mr. Martinez's case, I was also responsible for numerous other complex habeas appeal, and direct criminal appeal cases.  That has continued throughout the time I handled Mr. Martinez's case.  During 2002-2004, I was particularly tasked with a very large and complex case load that required me to research and develop involved legal issues, prepare for and conduct evidentiary hearings, litigate contested discovery concerning the California Board of Prison Terms, and the like.  Beginning in July 2003 and continuing throughout 2004, I was also tasked with supervision responsibility for the noncapital habeas and appeals unit.  During 2002, I estimate that in addition to Mr. Martinez's case, at any given time I had to attend no less than 11 other active cases (January 2002) and more often than not, I was juggling 14-23 other active cases.  According to our internal office standards, these levels of habeas/appeals cases is far more than a full-time case load.
>
> 5.  Because of the other demands on my time, I was able to complete drafting a state exhaustion petition by the time I filed an amended exhausted federal petition and sought a stay of the federal proceedings in January 2003.  I sought, by filing the notice of claims (docket entry no. 12), to identify the unexhausted claims so that the state and courts would be aware of the claims we were going to exhaust through the state court system.  I then continued to attend to my caseload to the best of my abilities.  Unfortunately, both my caseload and my administrative responsibilities increased and remained at such high levels through out 2003 and 2004 that I was unable to timely attend to all tasks needed in all my cases.  In the context of Mr. Martinez's case, I was unable to re-review the records and prepare the state exhaustion petition until I received additional assistance.  That assistance

1  came in the from [sic] a law student who was able to bear the brunt of the labor
   involved in reviewing the file notes and draft the state exhaustion petition.  This
2  drafting work was completed under my direct supervision by the end of the
   summer of 2004.  I was finally able to complete my edits and put together the
3  necessary exhibits, tables and the like in late October 2004.  I mailed the
   completed exhaustion petition to Clerk of the California Supreme Court on or
4  about November 3, 2004.

5  6.  Throughout the representation of Mr. Martinez, I received communications
   from him and his family inquiring about the status of the case.  Mr. Martinez was
6  housed at Pelican Bay State Prison which, at a minimum, delayed
   communications.  If my recall is correct, Mr. Martinez also wrote to me
7  exclusively in Spanish.  As I am not fluent in Spanish, I relied on our staff
   interpreter to translate letters to and from Mr. Martinez.  This added step delayed
8  our communications, but not significantly so.  Mr. Martinez's family members,
   who called from time to time, did not have this language barrier.  Although I
9  cannot give an estimate with any degree of accuracy, Mr. Martinez's family
   members rather regularly called me and asked about the status of the case.  As I
10 never expected the delay between the stay request (January 2003) and the state
   petition filing (November 2004) to be so long, I never informed Mr. Martinez or
11 his family that the delay would be this long.  I worked long and hard to manage a
   caseload and administrative responsibilities that were far more than a full time
12 job.  Mr. Martinez's state exhaustion petition was delayed as a result of those
   honest, but inadequate efforts.

13

14 McClintock declaration.

15       Ordinary attorney negligence will not justify equitable tolling.  Spitsyn v. Moore,

16 345 F.3d 796, 800 (9th Cir. 2003), as amended Nov. 3, 2003.  Where an attorney's misconduct is

17 sufficiently egregious, it may constitute an "extraordinary circumstance" warranting equitable

18 tolling of AEDPA's statute of limitations.  Id.

19       When the Federal Defender was appointed to represent petitioner on February 1,

20 2002, only approximately 2 ½ months were left in the limitations period.  Therefore, Ms.

21 McClintock had only 2 ½ months to conduct an investigation and file a petition in the California

22 Supreme Court raising new claims.  The chances of any attorney being able to meet this deadline,

23 particularly in a case involving a conviction for first degree murder, were slim.  The court does

24 not find that Ms. McClintock engaged in misconduct justifying equitable tolling by failing to

25 determine what, if any, new claims needed to be exhausted prior to the time the limitations

26 period ran.  Accordingly, the court does not find that petitioner is entitled to equitable tolling

8

1  based on attorney misconduct.

2       In the traverse, petitioner also argues that he is entitled to equitable tolling

3  because he is illiterate and speaks only Spanish.  The Ninth Circuit has held in the context of

4  exhaustion and procedural default that the illiteracy of a pro se petitioner does not constitute

5  "cause" for his failure to present a claim in state court.  Hughes v. Idaho State Bd. of Corrections,

6  800 F.2d 905, 909 (9th Cir. 1986).  Consequently, the court cannot conclude that illiteracy is an

7  extraordinary circumstance sufficient to justify equitable tolling.

8       In Mendoza v. Carey, 449 F.3d 1065, 1071 (9th Cir. 2006), the Ninth Circuit

9  found that a "non-English speaking petitioner seeking equitable tolling must, at a minimum,

10  demonstrate that during the running of the AEDPA time limitation, he was unable, despite

11  diligent efforts, to procure either legal materials in his own language or translation assistance

12  from an inmate, library personnel, or other source."  449 F.3d at 1070.  In the instant case,

13  petitioner has not made that showing.  Accordingly, petitioner is not entitled to equitable tolling

14  based on his inability to speak English.

15       The court next considers whether the at-issue claim is timely on grounds that it

16  relates back to any of the timely claims.  Fed. R. Civ. P. 15(c) provides, in relevant part, that an

17  amendment of a pleading relates back to the date of the original pleading when 1) relation back is

18  permitted by the law that provides the statute of limitations applicable to the action, or 2) the

19  claim or defense asserted in the amended pleading arose out of the conduct, transaction, or

20  occurrence set forth or attempted to be set forth in the original pleading.

21       In Mayle v. Felix, 545 U.S. 644, 125 S. Ct. 2562 (2005) the Supreme Court held

22  that in habeas actions, the claims relate back if they share a common core of operative facts

23  uniting the original and newly asserted claims.

24       The parties do not dispute that the at-issue ineffective assistance of counsel claim

25  does not relate back to the ineffective assistance of counsel claims raised in the original petition,

26  because these claims are based on different types of alleged misfeasance.  See United States v.

9

1 <u>Ciampi</u>, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 'relation

2 back' standard merely by raising some type of ineffective assistance in the original petition, and

3 then amending the petition to assert another ineffective assistance claim based upon an entirely

4 distinct type of attorney misfeasance.").

5    In the traverse, petitioner argues that the at-issue ineffective assistance of counsel

6 relates back to claim one of the original petition which alleged jury misconduct based on the

7 jury's consideration of petitioner's incarceration.  In support of this claim, petitioner alleged that

8 three weeks after the verdict, juror 2 submitted a declaration "stateing [sic] pertinent 'facts' of

9 several instances of misconduct..."  Original Petition, p. 5, ¶ 3.  Petitioner also stated that at the

10 hearing on his motion for a new trial, this juror was questioned regarding this matter.  <u>Id.</u>, pp. 5-

11 5-A.

12    In the at-issue claim, petitioner alleges that following his trial, juror 2 approached

13 his lawyer with information that the jury had discussed petitioner's incarceration.  Petitioner

14 alleges that rather than interviewing her, counsel suggested that she write a letter to the court

15 about her concerns.  When the juror returned to counsel with the letter, counsel copied the letter

16 and told her to file it with the court.  Petitioner argues that his counsel was ineffective for failing

17 to interview this juror.

18    Petitioner now argues that the jury misconduct claim contained in the original

19 petition and the at-issue ineffective assistance of counsel claim share a "common core of

20 operative facts" which are: 1) juror 2 went to counsel's office; 2) juror 2 expressed her concern

21 about jury deliberations; 3) rather than investigating or interviewing juror 2, counsel told her to

22 write a letter to the court; 4) when juror 2 returned with the letter, trial counsel copied the letter

23 and told her to file it with the court.

24    Ineffective assistance of counsel claims have two components.  <u>Strickland v.</u>

25 <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that,

26 considering all the circumstances, counsel's performance fell below an objective standard of

1  reasonableness.  <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065.  Second, a petitioner must

2  affirmatively prove prejudice.  <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067.  Prejudice is

3  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

4  result of the proceeding would have been different."  <u>Id</u>. at 694, 104 S. Ct. at 2068.  A reasonable

5  probability is "a probability sufficient to undermine confidence in the outcome."  <u>Id</u>., 104 S. Ct.

6  at 2068.

7        In the instant case, the jury misconduct and at-issue ineffective assistance of

8  counsel claims share a common core of operative facts as to the prejudice prong of the <u>Strickland</u>

9  test set forth above.  However, these claims do not share a common core of operative facts as to

10 the reasonableness prong of the <u>Strickland</u> test.  An analysis of the reasonableness prong would

11 involve consideration of other facts such as why counsel chose not to interview juror 2 or

12 investigate her claims.  These facts are not shared by the juror misconduct claim.  Accordingly,

13 the court does not find that the at-issue ineffective assistance of counsel claim relates back to the

14 juror misconduct claim raised in the original petition.

15        For the reasons discussed above, the court finds that petitioner's claim alleging

16 ineffective assistance of counsel based on counsel's failure to interview juror 2 and investigate

17 her claims is barred by the statute of limitations.

18        B.  <u>Procedural Default</u>

19        Respondent argues that claim one alleging juror misconduct and the claim of

20 ineffective assistance of counsel based on counsel's failure to interview juror 2 are procedurally

21 barred.  These claims were raised for the first time in petitioner's habeas corpus petition filed in

22 the California Supreme Court.  The California Supreme Court denied the petition as untimely by

23 citing <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998).

24        Federal courts will generally not review a question of federal law decided by a

25 state court if its decision rests on a state law ground that is independent of the federal question

26 and adequate to support the judgment.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 750, 111 S.Ct.

2546 (1991).  For a state procedural rule to be independent, the state law basis for the decision must not be interwoven with federal law.  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, the state law ground for the decision must be well established and consistently applied.  Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999).

In Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003), the Ninth Circuit held that although the California untimeliness rules as expressed in In re Robbins was an independent procedural ground, the court could not conclude that it was an adequate procedural ground on the basis of the record before it.  The issue in the instant case is whether the timeliness rule is adequate.

Once the government has pleaded the existence of an independent and adequate state procedural ground as an affirmative defense, as they have done in this case, the burden to place that defense in issue shifts to petitioner.  Bennett v. Mueller, 322 F.3d 575, 586 (9th Cir. 2003).  The petitioner may "satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of a state procedure, including citation to authority demonstrating inconsistent application of the rule."  Id.  The burden then shifts back to the government, and it bears the "ultimate burden of proving the adequacy" of the relied-upon ground.  Id.

In King v. Lamarque, 464 F.3d 963, 968 (9th Cir. 2006) the Ninth Circuit held that simply contesting the adequacy of the California timeliness rule was sufficient to meet the petitioner's burden under Bennett because the Ninth Circuit has previously found the rule to be too ambiguous to bar federal review during the applicable time period.  464 F.3d at 966, citing Morales v. Calderon, 85 F.3d 1387, 1391 (9th Cir. 1996).  In the instant case, because petitioner has contested the adequacy of this rule in his traverse, the burden shifts to the government to prove the adequacy of the timeliness rule.

The precise way by which the state satisfies its burden in proving the adequacy of a state procedural rule is unclear.  In evaluating the adequacy of rules, district courts are left to grapple with shadows.  Rather than ordering further briefing from respondent regarding this

1   matter, the court will address the merits of the juror misconduct claim.  As discussed above,

2   petitioner's claim alleging ineffective assistance of counsel based on counsel's failure to

3   interview Juror 2 is barred by the statute of limitations.

4            C.  Juror Misconduct

5            Petitioner argues that the jury committed five types of misconduct: 1) the jury

6   considered the fact that he was incarcerated; 2) the jury disregarded instructions regarding the

7   presumption of innocence and presumed that petitioner was guilty based on his attorney's less

8   than vigorous defense; 3) the jury showed bias against petitioner because he used a translator

9   during the trial; 4) jurors impermissibly considered sentencing while deliberating; 5) jurors

10  discussed the case amongst themselves during recesses and prior to the close of evidence.

11           On direct appeal, the California Court of Appeal issued a reasoned opinion

12  addressing petitioner's claim that the jury committed misconduct by discussing his incarceration.

13  Respondent's Lodged Document No. 4.  The California Supreme Court denied petitioner's

14  petition for review without comment or citation.  Id., no. 6.  Accordingly, the court considers

15  whether the denial of this claim by the California Court of Appeal was an unreasonable

16  application of clearly established Supreme Court authority.  Shackleford v. Hubbard, 234 F.3d

17  1072, 1079 n. 2 (9th Cir. 2000).

18           Petitioner raised his other claims of jury misconduct in his habeas corpus petition

19  filed in the California Supreme Court.  Id., no. 7.  As discussed above, the California Supreme

20  Court did not address the merits of these claims but instead found them time-barred.

21  Respondent's Lodged Document 8.  For the reasons discussed above, the court has determined to

22  bypass procedural bar and turn to the merits.  Accordingly, this court will conduct a de novo

23  review of these claims.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (holding that de

24  novo review is appropriate where "a state court has not reached the merits of a properly raised

25  issue.").

26  \\\\\

1    The Sixth Amendment affords criminal defendants the right to trial by an

2 impartial jury.  Due process requires that the defendant be tried by "a jury capable and willing to

3 decide the case solely on the evidence before it."  <u>Smith v. Phillips</u>, 455 U.S. 209, 217, 102 S. Ct.

4 940, 946 (1982).  "When the jury breaches this duty by considering extraneous facts not

5 introduced in evidence, 'a defendant has effectively lost the rights of confrontation, cross-

6 examination, and the assistance of counsel with regard to jury consideration of the extraneous

7 evidence.'"  <u>Hughes v. Borg</u>, 898 F.2d 695, 700 (9th Cir. 1990) (quoting <u>Gibson v. Clanon</u>, 633

8 F.2d 851, 854 (9th Cir. 1980)).

9    When the jury considers extraneous information, petitioner bears the burden of

10 establishing that a juror's consideration of extrinsic material had a "substantial and injurious

11 effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637,

12 113 S. Ct. 1710, 1721 (1993); <u>Lawson v. Borg</u>, 60 F.3d 608, 613 (9th Cir. 1995).

13    The "near-universal and firmly established common-law rule" in the United States

14 "flatly prohibit[s]" the admission of juror testimony to impeach a verdict except where an

15 "extraneous influence" affected the verdict.  <u>Tanner v. United States</u>, 483 U.S. 107, 117, 107 S.

16 Ct. 2739, 2746 (1987).  "Federal Rule of Evidence 606(b) is grounded in the common-law rule

17 against admission of jury testimony to impeach a verdict and the exception for juror testimony

18 relating to extraneous influences."  <u>Tanner</u>, 482 U.S. at 121, 107 S. Ct. at 2748.  Fed. R. Evid.

19 606(b) provides,

20    (b) Upon an inquiry into the validity of a verdict or indictment, a juror may not
     testify as to any matter or statement occurring during the course of the jury's
21    deliberations or to the effect of anything upon that or any other juror's mind or
     emotions as influencing the juror to assent to or dissent from the verdict or
22    indictment or concerning the juror's mental processes in connection therewith.
     But a juror may testify about (1) whether extraneous prejudicial information was
23    improperly brought to the jury's attention, (2) whether any outside influence was
     improperly brought to bear upon any juror, or (3) whether there was a mistake in
24    entering the verdict onto the verdict form.  A juror's affidavit or evidence of any
     statement by the juror may not be received on a matter about which the juror
25    would be precluded from testifying.

26 Fed. R. Evid. 606(b).

14

1      Rule 606(b) is applied in habeas corpus actions. <u>Sassaumian v. Roe</u>, 230 F.3d

2  1097, 1108 (9th Cir. 2000). This court now considers each alleged instance of jury misconduct.

3  Petitioner first alleges that the jury improperly considered the fact that he was incarcerated.

4  Following petitioner's trial, the trial court held a hearing regarding this matter where juror 2, later

5  identified as Glenda Griffin, testified regarding this matter:

6          Petitioner's Counsel: In your deliberations, did you discuss the fact that Mr.
           Martinez was incarcerated?
7
8          Juror 2: Yes, they did. They brought that up as well. They wondered why he was
           incarcerated, what else he had done.

9          Petitioner's Counsel: The fact that he was incarcerated, did that factor weigh in
           your deliberations as jurors?
10
           Juror 2: Yes, it did.
11
           Petitioner's Counsel: What was said in regard to his incarceration that affected
12         your deliberations?

13         Juror 2: I think just the fact that people felt, in their own mind, that he had done
           something else, other than this particular crime, that was the reason why he was
14         incarcerated.

15         Court: I'll note that for the record and I'll sustain that.

16         Petitioner's Counsel: Well, did anyone say in the deliberations that the fact that he
           was incarcerated led to them–to a guilty verdict?
17
           Juror 2: No, but you could tell by the remarks and they–the way they said it, that it
18         affected their opinion.

19         Prosecutor: Objection.

20         Court: I will sustain that. What remarks did people make specifically, ma'am?

21         Juror 2: Okay. Specifically like–well, obviously he did something or who knows
           what he did, and making insinuations of things that he could have done, why he
22         was incarcerated. So he gave them a bad attitude toward this case, the fact that he
           was incarcerated.

23         *****
24
           Prosecutor: Yes, Your Honor. Did the jurors agree to take into consideration the
25         fact that he was incarcerated? Did all twelve jurors say: We want to take the fact
           that he was incarcerated and use it as a reason to convict him?
26

1          Juror 2: No.

2          Prosecutor: Did anyone say: Since he's incarcerated, I am voting guilty?

3          Juror 2: No.

4          Prosecutor: So when you say that they spoke about his incarceration, it was more
           of individual jurors just wondering.  I wonder why he's being incarcerated?
5
           Juror 2: Exactly.
6

7   RT 391-392.

8          In the declaration submitted in support of the instant petition juror Glenda Griffin,

9   states,

10         7.  During deliberations in Mr. Martinez's case, jurors used information that was
           not evidence admitted during the trial.  Some jurors stated facts about Mr.
11         Martinez that were not in evidence.  This evidence included claims that Mr.
           Martinez was in jail on another crime and that he was a problem child.
12

13  Griffin declaration, ¶ 7.

14         Griffin's statement in her declaration that other juror's claimed that petitioner was

15  in jail on another crime is not inconsistent with her testimony at the hearing in state court quoted

16  above that some jurors speculated that he was incarcerated for other crimes.  Griffin's declaration

17  does not state that the jury actually received information from an outside source that petitioner

18  was in custody on other charges.

19         Although it is not entirely clear how petitioner's incarceration was known to the

20  jury, it must have been obvious based on his appearance as they were instructed not to consider

21  the fact that he was in custody.  See at CT 338.  The California Court of Appeal also noted that

22  this fact, i.e. petitioner's incarceration, was "evidence to everyone associated with the trial."

23  Respondent's Lodged Document No. 4, p. 8.

24         The source of the jury's knowledge that petitioner was incarcerated was not

25  extraneous: "It did not enter the jury room through an external prohibited route.  It was part of

26  the trial, and was part of the information each juror collected.  It should not have been discussed

                                              16

1   by the jury, and indeed was the subject of a jury instruction to that effect.  But it was not

2   'extraneous information,' and therefore does not fall within the exception outlined in Rule

3   606(b)." United States v. Rodriguez, 116 F.3d 1225, 1227 (8th Cir. 1997) (rejecting argument

4   that defendants' failure to testify was extraneous information because "[i]t was part of the trial");

5   United States v. Bussell, 414 F.3d 1048 (9th Cir. 2005) (speculation by some jurors that reason

6   defendant's husband was no longer part of the case was because he pled guilty was not in nature

7   of extraneous prejudicial information; alleged source of information was not extraneous to the

8   trial but an instruction by district court after husband died); United States v. Rutherford, 371 F.3d

9   634, 640 (9th Cir. 2004) (upholding district court's denial of new trial because Rule 606(b)

10  barred consideration of declarations stating that jurors ignored court's instructions and discussed

11  defendant's failure to testify);  United States v. Martinez-Moncivais, 14 F.3d 1030, 1036 (5th

12  Cir. 1994) (holding that post-trial statements that juror believed that if defendant had been

13  innocent, he would have taken the stand did not fall into the "narrow exception that arises when

14  there is evidence of outside influences on the jury"); compare with United States v. Keating, 147

15  F.3d 895, 903 (9th Cir. 1998) (describing the defendant's prior conviction as extrinsic evidence

16  because it was "entirely new and inadmissible").

17          The juror's speculation that petitioner was incarcerated because he had committed

18  other offenses and that he was a problem child "was the product of normal human curiosity, part

19  of the 'general knowledge, opinions, feelings, and bias' which are 'carefully distinguished' from

20  "[t]he type of after-acquired information that potentially taints a jury's verdict." Hard v.

21  Burlington N. R.R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989).  The jury's speculation regarding

22  these matters was not based on receipt of extraneous information.

23          Accordingly, the evidence submitted by petitioner that the jury improperly

24  considered his incarceration, i.e., the Griffin declaration as well as the transcript from the hearing

25  regarding this matter in state court, is inadmissible.  For this reason, this claim of jury

26  misconduct is without merit.  The denial of this claim by the California Court of Appeal was not

17

1   an unreasonable application of clearly established Supreme Court authority.[2]

2          Petitioner next argues that the jury committed misconduct by disregarding

3   instructions regarding the presumption of innocence and presuming him guilty based on his

4   attorney's less than vigorous defense.  In support of this claim, petitioner refers to Glenda

5   Griffin's declaration where she states, in relevant part,

6          8.  Jurors during the deliberations also directly disregarded the judge's
            instructions that the state had the burden to prove Mr. Martinez's guilt and that we
7          were to presume Mr. Martinez was innocent unless and until the state met its
            burden beyond a reasonable doubt.  Jurors specifically stated that because Mr.
8          Paniero did not put on a defense to the state's evidence, that meant that Mr.
            Martinez must be guilty.  Regarding Mr. Paniero's efforts, I recall one juror
9          saying, "The fact that his attorney isn't defending him shows he's guilty."

10  Griffin declaration.

11         The source of the juror's opinion that petitioner did not receive a good defense

12  was not extraneous to the trial.  Rather, it was based on their observations of the trial

13  proceedings.  Accordingly, evidence that the jury considered the quality of petitioner's defense is

14  not admissible.  For this reason, this claim of jury misconduct is without merit.  After conducting

15  a de novo review of the record, the court recommends that this claim be denied.

16          Petitioner next argues that the jury was biased against him because he used a

17  translator during the trial.  Petitioner argues that the jury committed misconduct by discussing

18  this fact during the trial.  In support of this claim, petitioner refers to the declaration of Glenda

19  Griffin who states that during deliberations, "[s]ome jurors commented negatively that Mr.

20  Martinez used an interpreter during the trial when he knew how to speak English."  Griffin

21  declaration, ¶ 7.

22          The source of the jury's knowledge that petitioner used a translator was not

23  extraneous to the trial.  Rather, it was based on the jury's observations of the trial proceedings.

24  _____

25      [2]  The California Court of Appeal considered juror 2's testimony at the hearing on
    petitioner's new trial motion and determined that no misconduct occurred.  Respondent's Lodged
26  Document No. 4, pp. 8-9.  Even assuming the evidence was sufficient to show misconduct, the
    state appellate court found that petitioner was not prejudiced.  Id.

1   Accordingly, evidence that the jury discussed petitioner's use of a translator is not admissible to

2   either the jury misconduct or jury bias claims.  Accordingly, these claims are without merit.

3   After conducting a de novo review of the record, the court recommends that these claims be

4   denied.

5          Petitioner argues that the jury committed misconduct by considering sentencing

6   while deliberating.  In support of this claim petitioner refers to the declaration of Glenda Griffin

7   and juror Margaret Gause.  Juror Gause states that during deliberations, one of the jurors

8   commented that petitioner was a minor when the shooting took place.  Second Amended

9   Petition, Gause declaration.  This juror stated that if convicted, petitioner would be kept in

10  custody until he was 21 to 25 years of age.  Glenda Griffin states that two male jurors tried to

11  convince her to convict petitioner by stating that he would receive only a 15 year sentence and

12  that he would be released from prison in seven and a half years.  Griffin declaration, ¶ 7.

13  Another juror told Griffin that if convicted petitioner would be out of prison when he was 25 to

14  26 years old.  Id.

15         Nothing in the record suggests that the information regarding the possible

16  sentences petitioner might receive came from an outside source.  Rather, the jurors were

17  apparently speculating regarding what sentence they thought petitioner would receive.  Therefore,

18  petitioner's evidence regarding the jury's discussion of the his possible sentences is inadmissible.

19  U.S. v. Straach, 987 F.2d 232, 242 (5th Cir. 1993) (holding that although the jury improperly

20  discussed penalties that might be imposed against the defendant, the verdict must stand where

21  there is no evidence that they learned of these matters from an outside source); see also

22  McDowell v. Calderon, 107 F.3d 1351, 1367 (9th Cir.) (evidence inadmissible pursuant to Fed.

23  R Evid. 606(b) that juror argued during deliberations that "a sentence of life without

24  parole...wouldn't mean 'without parole.'"), vacated en banc in other parts, 130 F.3d 833 (9th Cir.

25  1997).  For these reasons, petitioner's claim that the jury committed misconduct by considering

26  his sentence during deliberations is without merit.  After conducting a de novo review of the

record, the court recommends that this claim should be denied.

Finally, petitioner argues that the jurors committed misconduct by discussing the case amongst themselves during recesses and prior to the close of evidence.  In support of this claim, petitioner cites a portion of the transcript from the hearing on petitioner's motion for a new trial where Glenda Griffin testified:

> Prosecutor: Now, you guys were in deliberations for about---
>
> Juror 2: Two days.
>
> Prosecutor:  —two days, about nine hours.  How much time would you say was discussing the incarceration issue?
>
> Juror 2: Oh, it was just brought up.
>
> Prosecutor: Like a minute?
>
> Juror 2: A few different times, yeah, it was not a long time.
>
> Prosecutor: Of the twelve jurors, how many of them discussed the incarceration issue?
>
> Juror 2: I can't say for sure because when it was brought up–and somebody mentioned it a couple of times.  In fact, it was also discussed while we were going to lunch one day, it was brought up.  So sometimes you get people kind of mumbling and so you're not really sure if they're discussing that or if they're just talking about something else so...
>
> Prosecutor: So you're not even sure if they were discussing this case or not?
>
> Juror 2: They were mumbling after that remark was made.
>
> Prosecutor:  Right.
>
> Juror 2: Possibly not.

RT at 393.

Premature deliberations are not as serious as other jury misconduct such as private communication, outside contact or tampering.  Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004).  "What is crucial is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury."  Id. at 653.  To succeed on this claim, petitioner "must allege facts which, if proved, would show that the premature

1   deliberations prejudiced him." Belmontes v. Brown, 414 F.3d 1094, 1124-25 (9th Cir. 2005),

2   reversed on other grounds, Ayers v. Belmontes, ___ U.S. ___, 127 S. Ct. 469 (2006).

3           In the instant case, petitioner has alleged no facts demonstrating that the

4   "mumbling" regarding petitioner's incarceration by the jury prejudiced him.  Accordingly, this

5   claim is without merit.  After conducting a de novo review of the record, the court recommends

6   that this claim be denied.

7           D.  Prosecutorial Misconduct

8           Petitioner contends that the prosecutor committed misconduct during closing

9   argument by making statements which were calculated to arouse the passions and prejudices of

10  the jury.  The California Court of Appeal was the last state court to issue a reasoned decision

11  denying this claim.  Respondent's Lodged Document no. 4.  Accordingly, the court considers

12  whether the denial of this claim by the California Court of Appeal was an unreasonable

13  application of clearly established Supreme Court authority.  Shackleford v. Hubbard, 234 F.3d

14  1072, 1079 n. 2 (9th Cir. 2000).

15          Petitioner argues that the following closing argument constituted misconduct:

16          And Detective Dugger told you why Mondo Posada came in here.  At first he said,
            "I'm not a gang member, I don't know what Eastside Stocktone is."  Then he said,
17          "I've heard of them."  Mr. Panerio asks him questions and he says, "Yeah, I
            belong to Eastside Stocktone."  They don't care when a shooting like this
18          happens.  The person who did the shooting, he thinks nobody cares, nobody cares
            if I shoot this guy on this bike who is in Eastside Stocktone territory.
19
            Do you know what happens?  Somebody does care.  Somebody called 911 and
20          that person cared.  And somebody like Deputy Bender, the first guy on the scene,
            he cared.  He showed up and he cared.  And then more deputies showed up and
21          then detectives and then sergeants and then an ambulance and all of a sudden
            people start caring and now he's hoping that the DA doesn't care.  But the DA did
22          care and now he's hoping–you're their last resort.  Maybe you don't care.  That's
            what I'm talking about.
23
            This is about caring about your community.  That's why it's called People of the
24          State of California versus Luis Martinez.

25  RT at 266-267.

26  \\\\\

                                                    21

1    Resolution of a prosecutorial misconduct claim concerning comments in closing

2    argument requires an inquiry into whether the "prosecutor's comments 'so infected the trial with

3    unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright,

4    477 U.S. 168, 181, 106 S. Ct. 2464 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637,

5    643, 94 S. Ct. 1868 (1974)).  "Improper comment warrants reversal only if it appears that the

6    comment may possibly have affected the verdict."  Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir.

7    1987).

8    With regard to analyzing claims of prosecutorial misconduct during closing

9    argument, the Supreme Court has stated,

10    [i]solated passages of a prosecutor's argument, billed in advance to the jury as a
      matter of opinion not of evidence, do not reach the same proportions [as "[t]he
11    'consistent and repeated misrepresentation' of a dramatic exhibit in evidence"]
      ...[A] court should not lightly infer that a prosecutor intends an ambiguous remark
12    to have its most damaging meaning or that a jury, sitting through a lengthy
      exhortation, will draw that meaning from the plethora of less damaging
13    interpretations.

14    Donnelly v. DeChristoforo, 416 U.S. at 646-47, 94 S. Ct. 1868.

15    A prosecutor may not make statements calculated to arouse the passions or

16    prejudices of the jury.  U.S. v. Monaghan, 741 F.2d 1434, 1441 (9th Cir. 1984).  "A prosecutor

17    may not urge jurors to convict a criminal defendant in order to protect community values,

18    preserve civil order, or deter future lawbreaking."  Id.  "The evil lurking in such prosecutorial

19    appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or

20    innocence."  Id.  "Jurors may be persuaded by such appeals to believe that, by convicting a

21    defendant, they will assist in the solution of some pressing social problem."  Id.  The

22    amelioration of society's woes is far too heavy a burden for the individual criminal defendant to

23    bear."  Id.

24    In the argument quoted above, the prosecutor argued that petitioner and the other

25    gang members in the truck at the time of the murder wrongly thought that they could get away

26    with the killing because people in Stockton did not care about gang members killing other gang

members.  The prosecutor's statement "this is about caring about your community" was made in the context of his argument to the jury that all life was worthwhile.  This argument was not improper.  The prosecutor did not argue, for example, that the jury should convict petitioner in order to do something about gang problems in the community.  See U.S. v. Monaghan, 741 F.2d 1434, 1441 n. 30, citing United States v. Wiley, 534 F.2d 659, 665 (6th Cir. 1976) (prosecutor's comment that "if this man goes free you have chalked up one point for the criminal."); see also United States v. Barlin, 686 F.2d 81, 93 (2d Cir. 1982) (condemning prosecutorial appeal to "do something about the drug traffic in our community;")).

For the reasons discussed above, the court finds that the argument quoted above did not constitute prosecutorial misconduct.  Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

E.  Ineffective Assistance of Counsel

1.  Standards for Ineffective Assistance of Counsel

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

\\\\\

1    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

2   693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

3   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

4   694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

5   confidence in the outcome."  Id., 104 S. Ct. at 2068.

6    In extraordinary cases, ineffective assistance of counsel claims are evaluated

7   based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

8   1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

9    The Supreme Court has recently emphasized the importance of giving deference

10   to trial counsel's decisions, especially in the AEDPA context:

11       In Strickland we said that "[j]udicial scrutiny of a counsel's
        performance must be highly deferential" and that "every effort
12       [must] be made to eliminate the distorting effects of hindsight, to
        reconstruct the circumstances of counsel's challenged conduct, and
13       to evaluate the conduct from counsel's perspective at the time."
        466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is
14       presented with an ineffective-assistance claim not subject to §
        2254(d)(1) deference, a [petitioner] must overcome the
15       "presumption that, under the circumstances, the challenged action
        'might be considered sound trial strategy.'"  Ibid. (quoting Michel
16       v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

17       For [petitioner] to succeed, however, he must do more than show
        that he would have satisfied Strickland's test if his claim were
18       being analyzed in the first instance, because under § 2254(d)(1), it
        is not enough to convince a federal habeas court that, in its
19       independent judgment, the state-court decision applied Strickland
        incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he
20       must show that the [ ]Court of Appeals applied Strickland to the
        facts of his case in an objectively unreasonable manner.

21

22   Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

23    2.  Analysis

24    As discussed above, petitioner's claim that counsel was ineffective for failing to

25   interview a juror when she came to him post-conviction with allegations of juror misconduct is

26   barred by the statute of limitations.

1       Petitioner alleges that his counsel was ineffective for failing to object to the

2  alleged improper closing argument by the prosecutor discussed above. The California Court of

3  Appeal was the last state court to issue a reasoned decision denying this claim.  Respondent's

4  Lodged Document no. 4.  Accordingly, the court considers whether the denial of this claim by the

5  California Court of Appeal was an unreasonable application of clearly established Supreme

6  Court authority.  <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

7       The California Supreme Court has also found that statements made by the

8  prosecutor during closing argument meant to arouse the prejudices of the jury may constitute

9  misconduct.  <u>See</u> <u>People v. Bradford</u>, 15 Cal.4th 1229, 1239 (Cal. 1997).  As discussed above,

10  applying this standard, the prosecutor's comments did not constitute improper argument.

11  Therefore, any objection by petitioner's counsel to this argument would have been overruled.

12  Therefore, the court does not find that petitioner has demonstrated that he suffered prejudice as a

13  result of counsel's failure to object.  Accordingly, the denial of this claim by the California Court

14  of Appeal was not an unreasonable application of clearly established Supreme Court authority.

15  This claim should be denied.

16       Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

17  writ of habeas corpus be denied.

18       These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20  days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  shall be served and filed within ten days after service of the objections.  The parties are advised

24  \\\\\

25  \\\\\

26  \\\\\

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 11/20/07

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

mart159.157